**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**Civil Action No:**

| | |
|---|---|
| ERIC SHEEHAN and BETH SCHEFFLER, Plaintiffs | ) ) ) ) ) |
| v. | ) ) |
| CHELSEA SOLDIER'S HOME, HOLYOKE SOLDIER'S HOME, EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVICES, DEPARTMENT OF VETERANS SERVICES, CHERYL POPPE, MATTHEW DEACON, ERIC JOHNSON, DIANE RANDOLPH, and KATHERYN BRUDNICKI Defendants | ) ) ) ) ) ) ) ) ) ) ) |

**COMPLAINT**

NOW COMES THE PLAINTIFFS in the above captioned matter as they humbly seek relief from this Honorable Court on multiple counts of malfeasance by the aforementioned listed Defendants. Plaintiffs assert and allege one count of a violation of United States Code in regards to the Whistleblower Protection Enhancement Act of 2012, with the remainder for violations of the Massachusetts General Laws, which are described forthwith:

**INTRODUCTION**

1. This is an action for relief brought forth to this Honorable Court by the Plaintiffs, who assert and allege multiple violations of law by the Defendants.

2. The Defendants, acting through the color of their positions, fired the Plaintiffs from their respective positions for raising various concerns at the Chelsea and Holyoke Soldiers Homes in the Commonwealth of Massachusetts.

3. Whistleblower laws enacted in 2012 (5 U.S.C. § 2302(b)(8)-(9)) prohibit retaliation against employees who file complaints.

4. At the request of Massachusetts Governor Charlie Baker, Plaintiff Eric Sheehan was tasked to identify and fix problems at the Holyoke Soldiers Home following the deaths of 76 United States military veterans in March 2020 due to COVID-19. He raised concerns

about how staff continued to place infected veteran/residents too near uninfected veteran/residents, and spoke with the Massachusetts Office of the Inspector General for issues surrounding the COVID-19 pandemic as well as shortcomings at the Holyoke and Chelsea Soldiers Homes.

5.  Plaintiff Beth Scheffler was the Acting Chief Nursing Officer at the Chelsea Soldiers Home, and she, too, filed a complaint with the Inspector General regarding safety and staffing problems at that institution.

6.  Both Plaintiffs were subsequently fired for their actions within four weeks of each other.

## PARTIES

7.  Plaintiff, Eric Sheehan ("Sheehan"),

8.  Plaintiff, Beth Scheffler ("Scheffler"),

9.  Defendant, Chelsea Soldier's Home ("CHE"),

10. Defendant, Holyoke Soldier's Home ("HLY"),

11. Defendant, Executive Officer of Health and Human Services ("EOHHS"),

12. Defendant, Department of Veterans Services ("DVS"),

13. Defendant, Cheryl Poppe ("Poppe"),

14. Defendant, Matthew Deacon ("Deacon"),

15. Defendant, Eric Johnson ("Johnson"),

16. Defendant, Diane Randolph ("Randolph"),

17. Defendant, Kathryn Brudnicki ("Brudnicki").

## JURISDICTION AND VENUE

18. The Court has Subject Matter Jurisdiction under the Whistleblower Protection Enhancement Act (WPEA) of 2012. 5 U.S.C. § 2302(b)(8)-(9);

19. The Court has Supplemental Jurisdiction over the Commonwealth of Massachusetts under 28 U.S. Code § 1367;

20. The Court has Personal Jurisdiction over the Defendants as they have acted, act, and threaten to act under the color of the laws of the Commonwealth of Massachusetts and

did so, do so, and threaten to do so within the geographic confines of the Commonwealth of Massachusetts;

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

### I.   Sheehan's Statement of Facts

#### A.   Sheehan's Employment for the Commonwealth of Massachusetts

22. Plaintiff Sheehan has a background in health care management, with over a decade of experience in regulatory enforcement for licensed health care facilities. Prior to working for the Veterans Homes, he was a Bureau Director for the Bureau of Health Care Safety and Quality, Massachusetts Department of Public Health ("DPH").

23. Sheehan was also a United States Marine, serving his country in the Corps on active duty from 1998-2001.

24. Sheehan worked as the Deputy Bureau Director for the Bureau of Health Care Safety and Quality of Massachusetts DPH from January 2015 to June 2015.

25. From June 2015 to March 2018, Sheehan was the Bureau Director for the Bureau of Health Care Safety and Quality of Massachusetts DPH.

26. Sheehan was appointed as the Assistant Secretary for Veterans Homes in the DVS in December 2020. Prior to that he was the Acting Superintendent from June 2020 to December 2020 and Deputy Superintendent of CHE from March 2019 to June 2020.

27. At this time, Poppe was the Acting Secretary of the Veterans Home.

28. On September 28, 2021, Sheehan had an interview with the Massachusetts Office of the Inspector General regarding issues surrounding the Novel Coronavirus pandemic ("COVID-19") and the shortcomings of the Soldiers Homes in Chelsea and Holyoke. This interview lasted approximately three and a half hours.

29. Sheehan had a subsequent interview with the Massachusetts Office of the Inspector General on October 14, 2021. This interview lasted approximately three hours.

30. Sheehan was terminated by the Commonwealth of Massachusetts on October 18, 2021.

## B.  The Chelsea Soldier's Home

31. During the Pandemic, Sheehan served as the CHE Incident Commander in Response to COVID-19. He held this position from March 6, 2020 through January 2021.

32. In January 2020, Sheehan began work with Chelsea Senior Leadership to prepare for the pandemic after a devastating outbreak of COVID-19 occurred in a Life Care Center nursing home in Kirkland, Washington.

33. In response to increasing awareness of the COVID-19 pandemic, the CHE Incident Command Team initiated a Continuity Of Operations Plan on March 16, 2020. Discussions for this plan began with the executive leadership team in January 2020.

34. The CHE Command Team was operational from March 2020 through January 2021. The leadership team worked between fifteen and twenty hours per day.

35. During Summer 2020, two assessments were done regarding the pandemic response at CHE.

36. The first assessment was performed by Sheehan, Scheffler, and Dr. Jed Barash, CHE Medical Director ("Barash").

37. The second assessment was performed by an independent source, Commonwealth Medicine, UMass Medical School.

38. These assessments revealed that some of the major contributing factors to COVID-19 with residents and staff were due to CHE's antiquated infrastructure, as well as community impact: 44 percent of the staff lived in the surrounding areas of Chelsea, Everett, Revere, Winthrop, and Lynn. Those five communities had the highest COVID rates in Massachusetts at that time.

39. Besides the obvious concerns relating to health care facilities during the pandemic, there were other challenges Sheehan faced in his position, including debating policies and protocol related to: screening protocols, the definition of a fever, staffing ratios, infection control protocols, CMS regulatory guidance versus DPH guidance, and communication with staff, family, and the community.

40. In Fall 2020, the Indoor Visitation Policy was at issue. Because of this issue, Acting Secretary Poppe accused Sheehan of insubordination. At that point, on or about October 15, 2020, Sheehan reported the issue, in writing, to Secretary of the EOHHS Marylou Sudders ("Sudders").

41. Sheehan had also briefed the DVS and EOHHS leadership several times about this ongoing issue.

42. Between December 2020 and October 2021, Sheehan brought many concerns to Poppe's attention, including that he had concerns about his role due to her behavior.

43. On February 19, 2021, Sheehan also raised concerns to Poppe about the discrimination against Plaintiff Scheffler at this time. Those concerns were ignored.

44. In May 2021, Sheehan returned to work after FMLA Medical Leave. As he was following up on the status of the facilities, he was informed by staff that Poppe had instructed them that they were not to contact of speak to Sheehan. These staff members were Mike Lazo, Eric Johnson, Chad Morin, Beth Scheffler, Aimee Desmaris, and Diane Randolph.

45. On September 21, 2021, Barash contacted Sheehan with several staffing and communications concerns.

46. Sheehan was out on FMLA Medical Leave at the time and forwarded Barash's concerns to Johnson with the expectation that it would be handled.

47. On October 1, 2021, Barash texted Sheehan requesting his assistance regarding guidance he received from Deacon and Brudnicki that he was prohibited from writing a recommendation letter for Scheffler.

48. On October 14, 2021, Sheehan emailed Beacon (General Counsel for DVS), Johnson (CHE Superintendent), Brudnicki (General Counsel for CHE), and Randolph (Human Resources Liaison for CHE).

49. This email outlined several of Sheehan's concerns regarding the termination of Acting Chief Nursing Officer Beth Scheffler including how he was concerned for the rights of employees, putting the Commonwealth in peril for wrongful termination, inappropriate guidance regarding recommendations as well as how this would jeopardize the health, welfare, and safety of the Home's residents.

50. On October 14, 2021, Sheehan emailed Deacon and Sharon Boyle General Counsel for EOHHS, regarding an employee at CHE who was concerned about it being a hostile work environment, and retaliation from two executives, Johnson and Poppe.

## C.  The Holyoke Soldier's Home

51. On April 6, 2020, Sheehan was asked by Deputy Secretary Dan Tsai to visit HLY and to provide an assessment of HLY.

52. Sheehan completed a memo where he listed a number of problematic areas.

53. With a goal of collaboration and knowledge sharing, Sheehan shared numerous memos and guidance to HLY on July 23, 2020, October 23, 2020, November 9, 2020, December 19, 2020, December 22, 2020, December 23, 2020, and January 10, 2021, with no engagement or response from HLY management.

54. On January 28, 2021, Sheehan informed Poppe that HLY was not following regulatory requirements.

55. On February 18, 2021, Sheehan informed Poppe that HLY was not following CMS and CDC requirements for cohorting residents appropriately.

56. On February 25, 2021, Sheehan reported to Poppe the lack of participation in HLY on the Electronic Medical Records Project.

57. On May 18, 2021, Sheehan shared memos that he had sent to Poppe and Interim Superintendent Lazo (HLY) with EOHHS Secretary Sudders. There was no response to Sheehan's email and memos.

58. This email provided a quick summary of the issues, which included:

    a.    Lack of leadership, engagement, and sense of urgency by HLY Superintendents;
    b.    Refusal to add clinical leadership to the EMR executive steering group while making unsubstantiated claims that the Homes are not following clinical best practices;
    c.    Poppe's continued undermining of the project's governance, calling into question the validity of the State's procurement procedure, and lack of clinical engagement;
    d.    Memo dated Mary 12, 2021 regarding HLY not following clinical best practices;
    e.    Memo dated January 26, 2021 regarding HLY infection control concerns; and
    f.    Memo dated February 19, 2021 regarding HLY cohorting concerns.

59. Sheehan made many attempts to get his concerns addressed, all to no avail.

60. When Sheehan questioned things further, he was told by Poppe that he was not to ask for any materials, and that the superintendents do not answer to him.

61. On January 14, 2021, Sheehan had also contacted Alda Rego, Assistant Secretary of EOHHS, stating that HLY did not have a COVID testing plan in place.

## II.     Scheffler's Statement of Facts

62. From February 2000 to September 2019, Scheffler worked for the Commonwealth of Massachusetts Division of Health Care Facility Licensure and Certification at DPH.

63. In April 2020, Plaintiff Scheffler worked as a Consultant Advance Nurse Practitioner for CHE.

64. In July 2020, Scheffler left the consultant role and was hired into the Acting Chief Nursing Officer ("CNO") role in response to the ongoing pandemic.

65. The job description for the CNO position that Scheffler held stated that as part of her job responsibilities, she was to evaluate and assist with regulatory compliance assistance in the departments she was assigned to manage, as well as assist other departments.

66. Scheffler noted numerous areas where evaluation and corrective action were needed to bring the facility current with the regulatory requirements. Scheffler raised these concerns both verbally and in writing.

67. In April 2020, when Scheffler began at CHE, there were concerns about the storage of confidential medical records.

68. Many of the discharge records required processing. Overflow records were not removed from the units. Items were misfiled, or not filed at all. Many documents were left in stacks. Efforts were made to move the records to the proper locations and ensure they were secured and not left on walking surfaces.

69. In December 2020, Johnson was appointed as Superintendent, after Sheehan was promoted to Assistant Secretary for DVS.

70. Johnson had long-term military experience as well as six years' experience as a licensed nursing home administrator. However, he had no experience in state service.

71. In May 2021, there were more than thirty (30) internal job postings for licensed practical nurses and certified nurses assistants. The jobs were internally posted until the last week of May and subsequently removed, a requirement before being posted externally for outside applicants. Most of these positions had been vacant since 2019. Staffing for these positions were covered by employees working overtime, or from a nurse staffing agency.

72. In May or June 2021, Scheffler was informed by Johnson that there was a staffing meeting scheduled for himself with Poppe, Randolph, and Brooke Leahy, DVS Chief of Staff, to discuss the open positions. Scheffler was intentionally not included in this

meeting.

73. In late June or early July 2021, Scheffler was informed by Randolph that the job postings were Scheffler's responsibilities.

74. Scheffler then confronted Randolph on this matter. Randolph then indicated she would no longer communicate with her regarding this particular matter, as well as on other HR matters going forward.

75. On July 13, 2021, Scheffler asked to meet with Randolph, as she was not responding to any of Scheffler's questions or concerns. Scheffler had reported this problem to Johnson, and the impact it had on staffing and staff, but Johnson told her that he did not want to get involved.

76. Brudnicki, General Counsel for CHE, was present at the meeting between Scheffler and Randolph. At this meeting, Randolph told Scheffler that sending emails with multiple parties attached could be considered a micro-aggression and public shaming. Randolph admitted at this meeting that she had been purposely ignoring Scheffler's emails or other communications.

77. In July 2021, there were concerns with Johnson not communicating critical infection control issues to others. During this time, Scheffler was informed by the Compliance Officer, Chad Morin ("Morin"), that a staff member had tested positive for COVID. Morin was notified when Johnson had instructed him to inform the proper oversight agencies.

78. Scheffler called Barash and found out that he had just been informed as well. Barash informed Johnson, and Scheffler informed the facility's epidemiologist because proper protocols had not been followed.

79. In August 2021, templates were created to address the staffing shortage at CHE. Scheffler was informed by HR these were to be created by Randolph as the initial ones she created were incorrect.

80. In early August 2021, Scheffler learned staff were unable to locate a deceased resident's medical record. It was at this time that Scheffler learned conditions in the medical records room had deteriorated since initial concerns were addressed in April 2020.

81. On August 6, 2021, Scheffler sent emails, including photographs of the medical records room to Johnson and requested that the problems in the medical records room be addressed. These emails were ignored.

82. Also during August 2021, Scheffler had ongoing phone calls with Deacon about the concerns with the medical records storage and concerns which would not be addressed by Johnson. Deacon advised Scheffler to inform legal counsel for DVS and CHE.

83. Scheffler informed Brudnicki via email and telephone as requested by Deacon.

84. On September 7, 2021, Scheffler spoke with Jessica Soares-Cabral ("Soares-Cabral") from HR Boston regarding questions about the job postings. Soares-Cabral informed Scheffler that CHE was not responding to her questions and Randolph had not completed previously agreed upon work with the postings. This information was inconsistent with what Randolph had said and documented.

85. On September 8, 2021, Scheffler spoke with Soares-Cabral regarding some inconsistencies with the job postings.

86. Because of these conversations, Johnson told Scheffler that she was not to communicate with Soares-Cabral any longer because it made CHE look bad. Scheffler told Johnson that her communication with Soares-Cabral was in regards to the lack of communication and answering questions for human resources. Johnson stated that Soares-Cabral was lying about the lack of communication and response.

87. On September 9, 2021, Scheffler sent an email to Patricia Famolare ("Famolare"), Chad Morin, John Coullard, Johnson, and Randolph because Johnson told Scheffler that the plan was not to post part-time positions and to fill those hours with agency nurses or with overtime and the plan to not immediately post all open full-time positions. Scheffler relayed her concern about patient care and budget impacts with this plan.

88. On September 9, 2021, Scheffler filed a hotline complaint with the Massachusetts Office of the Inspector General for fraud, waste, and abuse.

89. Later on September 9, 2021, Johnson went to Scheffler's office with Famolare to inform Scheffler and told her he was in trouble with Catherine Starr from HR and Poppe because Scheffler had scheduled interviews for LPN's.

90. Scheffler had been authorized by HR to schedule these interviews.

91. On September 15, 2021, Scheffler was informed that an agency LPN had tested positive for COVID.

92. Later the same day, Scheffler found out that despite the positive COVID case, Johnson had informed staff that they do not need to test for COVID; Scheffler had a concern regarding inadequate response.

93. Also on September 15, Scheffler had a conversation with Brudnicki regarding the lack of consistent adherence to COVID testing requirements being done in the facility.

94. On September 17, 2021, Famolare contacted Scheffler. Scheffler had requested information regarding patients' vaccination status. Scheffler had previously sent this information to Johnson but he stated that he could not find it.

95. On September 17, 2021, Scheffler requested a meeting with Johnson and Barash to discuss the communication issues in the facility. Scheffler had also spoken with Sheehan about these communication problems.

96. Scheffler also spoke with Brudnicki regarding these problems, specifically, communications regarding legislative requests for information not being forwarded to the appropriate people for two weeks.

97. During that conversation, Brudnicki informed Scheffler that she had spoken with the team about the testing concerns Scheffler had raised.

98. Brudnicki also informed Scheffler that Johnson was very happy with her performance, and that he wanted Scheffler to take the CNO position once it was vacated by the current CNO, who was on leave.

99. On September 20, 2021, Scheffler arrived to work and was informed that she was no longer required for the acting CNO position, effective immediately. She was initially told this was not for cause.

100.     She then received a second letter, given to her by Johnson, related to an expired contractor position, informing her that she was being let go for cause, without thirty days' notice.

101.     Scheffler did not receive a last paycheck on this date.

102.     Scheffler spoke with Brudnicki about her concerns, including questions about why security was present, as well as her benefits.

103.     Scheffler also asked Brudnicki why she received conflicting letters about her termination, one stating that she was being terminated for cause and the other stating she was not.

104.     Brudnicki told Scheffler that Massachusetts was an at-will employment state and also that the Acting role was a temporary position.

105.     Scheffler then spoke with Brudnicki for a second time on September 20, 2021. Brudnicki offered Scheffler a settlement if Scheffler agreed not to bring a lawsuit and not disparage the Home. When Scheffler questioned the amount for settlement, the agreement was withdrawn.

106.     During the second call, Scheffler was told that she was being terminated because Deacon had investigated Scheffler for an allegation of bullying days prior.

107.     Scheffler was neither informed nor was she interviewed regarding this allegation.

108.     Brudnicki later informed Scheffler that the investigation was initiated by Johnson, and that policy did not require that Scheffler be informed about the investigation or to participate.

109.     Scheffler never received any kind of warning about the investigation, the contents of the investigation, or a corrective action plan. Scheffler received no disciplinary actions or performance improvement plans at any time during her employment with the Commonwealth.

110.     Brudnicki later confirmed to Scheffler that she never occupied the Contractor role while in the Acting CNO role, but it was decided to re-activate the contractor contract on the same day Scheffler was terminated from it.

111.     It was at that time that Brudnicki also told Scheffler that because she was terminated from the contractor role and this information was sent by Randolph to Boston HR, Scheffler was being considered terminated for cause from the Acting CNO role as well.

112.     During this call, Scheffler asked about not receiving a last paycheck. Brudnicki said she would look into the situation.

113.     On September 30, 2021, Scheffler was contacted by Barash to inform her that though he wanted to do so, he could not give her a reference because Brudnicki told him it was the policy of the Home to not give them. He indicated that he was calling the Ethics Commission to confirm and was informed he could if there is no policy. Scheffler had an email from Brudnicki dated the day before that there was no such policy.

## **COUNT I**

**All Plaintiffs v. All Defendants**
**Violation of Whistleblower Protection Enhancement Act (WPEA) of 2012,**
**5 U.S.C. § 2302(b)(8)-(9)**

114.     Plaintiffs re-assert, re-allege, and re-avow paragraph Nos. 1 through and including 113 as though fully set forth herein.

115.     The Whistleblower Protection Enhancement Act of 2012 prohibit retaliation against employees who file complaints.

116.     5 U.S.C. § 2302(b)(8)-(9) states: (b) Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority—(8) take or fail to take, or threaten to take or fail to take, any personnel action against any employee or applicant for employment because of—(A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences—(i) a violation of the law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety; if such disclosure is not specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs; or (B) any disclosure to the Special counsel, or to the Inspector General of an agency or another employee designated by the head of the agency to receive such disclosures, of information which the employee or applicant reasonably believes evidences—(i) a violation of the law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety—(9) take or fail to take, or threaten to take or fail to take, any personnel action against any employee or applicant for employment because of—(A) the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation; (B) testifying for or otherwise lawfully assisting any individual in the exercise of any right referred to in subparagraph (A); (C) cooperating with or disclosing information to the Inspector General of an agency, or the Special Counsel, in accordance with applicable provisions of law; or (D) for refusing to obey an order that would require the individual to violate a law.

117.     In separate instances, Plaintiffs Sheehan and Scheffler contacted the Inspector General in order to report gross mismanagement regarding their observations and recommendations.

118.     Sheehan, in his role as an administrator, reported numerous shortcomings at CHE and at HLY, so noted in the following paragraphs as described above: Nos. 38 through and including 50, and 52 through and including 61.

119.     Scheffler, in her role as Acting CNO, reported numerous staffing shortages at CHE and issues with medical records at same, so noted in the following paragraphs as described above: Nos. 66 through and including 58, and Nos. 71 through and including 97.

120.     On or about September 9, 2021, as described in paragraph no. 88, Scheffler filed a hotline complaint with the Massachusetts Office of the Inspector General for fraud, waste, and abuse.

121.     On or about September 20, 2021, Scheffler's employment with the Commonwealth came to an abrupt conclusion, as described in paragraph nos. 98 through 101: she reported to work at CHE but was told informed that she was no longer required for the acting CNO position, effective immediately. She was initially told this was not for cause, but then received a second letter related to an expired contractor position, informing her that she was being let go for cause, without thirty days' notice. She was not paid.

122.     On or about September 28, 2021, as described in paragraph no. 28, Sheehan had an interview with the Massachusetts Office of the Inspector General regarding issues surrounding the COVID-19 pandemic and the shortcomings of the Soldiers Homes in Chelsea and Holyoke. This interview lasted approximately three and a half hours.

123.     Further, on or about October 14, 2021, as described in paragraph no. 29, Sheehan had a second interview with the Inspector General, this time for three hours.

124.     On or about October 18, 2021, as described in paragraph no. 30, Sheehan's employment with the Commonwealth came to its abrupt conclusion.

## COUNT II

### All Plaintiffs v. All Defendants
### Violation of G.L. c. 149 § 185

125.     Plaintiffs re-assert, re-allege, and re-avow paragraph Nos. 1 through and including 113 as though fully set forth herein.

126.     M.G.L. c. 149 § 185 is entitled Retaliation against employees reporting violations of law or risks to public health, safety or environment; remedies.

127.     As explained in paragraph nos. one seventeen and one eighteen and referencing the paragraph numbers in each, Plaintiffs Sheehan and Scheffler reported violations of law and risks to public health; to wit, Sheehan reported cohorting issues at HLY in regards to COVID-19 quarantine procedures, while Scheffler reported medical records and staffing issues.

128.     Both Plaintiffs assert they subsequently lost their jobs as a result of their reports to the Inspector General.

## COUNT III

**All Plaintiffs v. All Defendants**
**Violation of G.L. c. 151 § 19(1) and (5)**

129.     Plaintiffs re-assert, re-allege, and re-avow paragraph Nos. 1 through and including 113 as though fully set forth herein.

130.     M.G.L. c. 151 § 19 is in regard to Punishment for stated acts

131.     Paragraph 1 of § 19 reads as follows: Any employer and his agent, or the officer or agent of any corporation who discharges or in any other manner discriminates against any employee, including any employee in the domestic service of any family or person at his home, because such employee has complained of a violation of the provisions of this chapter, or has testified or is about to testify in any investigation or proceeding under or related to this chapter, or because such employer believes that said employee or individual may complain of a violation of the provisions of this chapter, shall have violated this section and shall be punished or shall be subject to a civil citation or order as provided in section 27C of chapter 149, and shall be liable for damages which shall not be less than one month's wages nor more than two month's wages of such individual, and the costs of the suit, including a reasonable attorney's fee.

132.     Paragraph 5 of § 19 reads as follows: Whoever directly or indirectly solicits, demands, requests or accepts from any employee any return of a portion of his wages, which would result in such employee retaining less than the rate of wages required by this chapter, or whoever threatens, coerces or intimidates any employee who has wages due under this chapter, for the purpose of causing such person to accept as payment in full a lesser sum than the full amount of the wages so due, shall have violated this section and shall be punished or shall be subject to a civil citation or order as provided in section 27C of chapter 149, and each employee so solicited or threatened shall constitute a separate offense. An employer who discharges or in any other manner penalizes or discriminates against an employee because the employee has made a complaint to the attorney general or any other person, or assists the attorney general in an investigation under this chapter, or has instituted, or caused to be instituted a proceeding under or related to this chapter, or has testified or is about to testify in the proceeding, or has taken any other action to seek rights under this chapter, shall have violated this section and shall be punished or shall be subject to a civil citation or order as provided in section 27C.

133.     Due to the actions of the Defendants as stated in Counts I and II, Plaintiffs assert that Count III is valid and that then triggers M.G.L. c. 149 § 27C, which reads as follows in its entirety: (a)(1) Any employer, contractor or subcontractor, or any officer, agent, superintendent, foreman, or employee thereof, or staffing agency or work site employer who willfully violates any provision of section 26, 27, 27A, 27B, 27F, 27G, 27H, 148, 148A, 148B or 159C or section 1A, 1B or 19 of chapter 151, shall be punished by a fine of not more than $25,000 or by imprisonment for not more than one year for a first

offense, or by both such fine and imprisonment and for a subsequent willful offense a fine of not more than $50,000, or by imprisonment for not more than two years, or by both such fine and such imprisonment.

(2) Any employer, contractor or subcontractor, or any officer, agent, superintendent, foreman or employee thereof, or staffing agency or work site employer who without a willful intent to do so, violates any provision of section 26, 27, 27A, 27B, 27F, 27G, 27H, 148, 148A, 148B or 159C or section 1A, 1B or 19 of chapter 151, shall be punished by a fine of not more than $10,000, or by imprisonment for not more than six months for a first offense, and for a subsequent offense by a fine of not more than $25,000 or by imprisonment for not more than one year, or by both such fine and such imprisonment. A complaint or indictment hereunder or under the provisions of the first paragraph may be sought either in the county where the work was performed or in the county where the employer, contractor, or subcontractor has a principal place of business. In the case of an employer, contractor, or subcontractor who has his principal place of business outside the commonwealth, a complaint or indictment may be sought either in the county where the work was performed or in Suffolk county.

(3) Any contractor or subcontractor convicted of willfully violating any provision of section 26, 27, 27A, 27B, 27F, 27G, 27H or 148B shall, in addition to any criminal penalty imposed, be prohibited from contracting, directly or indirectly, with the commonwealth or any of its agencies or political subdivisions for the construction of any public building or other public works, or from performing any work on the same as a contractor or subcontractor, for a period of five years from the date of such conviction. Any contractor or subcontractor convicted of violating any provision of section 26, 27, 27A, 27B, 27F, 27G, 27H or 148B shall, in addition to any criminal penalty imposed, be prohibited from contracting, directly or indirectly, with the commonwealth or any of its agencies, authorities or political subdivisions for the construction of any public building or other public works or from performing any work on the same as a contractor or subcontractor, for a period not to exceed six months from the date of such conviction for a first offense and up to three years from the date of conviction for subsequent offense. After final conviction and disposition of a violation pursuant to this paragraph in any court, the clerk of said court shall send a notice of such conviction to the attorney general, who shall publish written notice to all departments and agencies of the commonwealth which contract for public construction and to the appropriate authorities of counties, authorities, cities and towns that such person is prohibited from contracting, directly or indirectly, with the commonwealth or any of its authorities or political subdivisions for the period of time required under this paragraph. The attorney general may take such action as may be necessary to enforce the provisions of this paragraph, and the superior court shall have jurisdiction to enjoin or invalidate any contract award made in violation of this paragraph.

(b)(1) As an alternative to initiating criminal proceedings pursuant to subsection (a), the

attorney general may issue a written warning or a civil citation. For each violation, a separate citation may be issued requiring any or all of the following: that the infraction be rectified, that restitution be made to the aggrieved party, or that a civil penalty of not more than $25,000 for each violation be paid to the commonwealth, within 21 days of the date of issuance of such citation. For the purposes of this paragraph, each failure to pay an employee the appropriate rate or prevailing rate of pay for any pay period may be deemed a separate violation, and the pay period shall be a minimum of 40 hours unless such employee has worked fewer than 40 hours during that week.

(2) Notwithstanding the foregoing, the maximum civil penalty that may be imposed upon any employer, contractor or subcontractor, who has not previously been either criminally convicted of a violation of the provisions of this chapter or chapter 151 or issued a citation hereunder, shall be no more than $15,000, except that in instances in which the attorney general determines that the employer, contractor or subcontractor lacked specific intent to violate the provisions of this chapter or said chapter 151, the maximum civil penalty for such an employer, contractor or subcontractor who has not previously been either criminally convicted of a violation of the provisions of this chapter or said chapter 151 or issued a citation hereunder shall be not more than $7,500. In determining the amount of any civil penalty to be assessed hereunder, said attorney general shall take into consideration previous violations of this chapter or said chapter 151 by the employer, the intent by such employer to violate the provisions of this chapter or said chapter 151, the number of employees affected by the present violation or violations, the monetary extent of the alleged violations, and the total monetary amount of the public contract or payroll involved.

(3) In the case of a citation for violating any provision of section 26, 27, 27A, 27B, 27F, 27G, 27H or 148B, the attorney general may also order that a bond in an amount necessary to rectify the infraction and to ensure compliance with sections 26 to 27H, inclusive, and with other provisions of law, be filed with said attorney general, conditioned upon payment of said rate or rates of wages, including payments to health and welfare funds and pension funds, or the equivalent payment in wages, on said public works to any person performing work within classifications as determined by the commissioner. Upon any failure to comply with the requirements set forth in a citation, said attorney general may order the cessation of all or the relevant portion of the work on the project site. In addition, any contractor or subcontractor failing to comply with the requirements set forth in a citation or order, shall be prohibited from contracting, directly or indirectly, with the commonwealth or any of its agencies or political subdivisions for the construction of any public building or other public works, or from performing any work on the same as a contractor or subcontractor, for a period of one year from the date of issuance of such citation or order. Any contractor or subcontractor who receives three citations or orders occurring on three different occasions, each of which includes a finding of intent, within a three year period shall automatically be debarred for a period of two years from the date of issuance of the third such citation or order or a final court

order, whichever is later. Any debarment hereunder shall also apply to all affiliates of the contractor or subcontractor, as well as any successor company or corporation that said attorney general, upon investigation, determines to not have a true independent existence apart from that of the violating contractor or subcontractor.

(4) Any person aggrieved by any citation or order issued pursuant to this subsection may appeal said citation or order by filing a notice of appeal with the attorney general and the division of administrative law appeals within ten days of the receipt of the citation or order. Any such appellant shall be granted a hearing before the division of administrative law appeals in accordance with chapter 30A. The hearing officer may affirm or if the aggrieved person demonstrates by a preponderance of evidence that the citation or order was erroneously issued, vacate, or modify the citation or order. Any person aggrieved by a decision of the hearing officer may file an appeal in the superior court pursuant to the provisions of said chapter 30A.

(5) In cases when the decision of the hearing officer of the division of administrative law appeals is to debar or suspend the employer, said suspension or debarment shall not take effect until 30 days after the issuance of such order; provided, however, that the employer shall not bid on the construction of any public work or building during the aforementioned 30 day period unless the superior court temporarily enjoins the order of debarment or suspension.

(6) If any person shall fail to comply with the requirements set forth in any order or citation issued by the attorney general hereunder, or shall fail to pay any civil penalty or restitution imposed thereby within 21 days of the date of issuance of such citation or order or within 30 days following the decision of the hearing officer if such citation or order has been appealed, excluding any time during which judicial review of the hearing officer's decision remains pending, said attorney general may apply for a criminal complaint or seek indictment for the violation of the appropriate section of this chapter.

(7) Notwithstanding the provisions of paragraph (6), if any civil penalty imposed by a citation or order issued by the attorney general remains unpaid beyond the time period specified for payment in said paragraph (6), such penalty amount and any restitution order, together with interest thereon at the rate of 18 per cent per annum, shall be a lien upon the real estate and personal property of the person who has failed to pay such penalty. Such lien shall take effect by operation of law on the day immediately following the due date for payment of such fine, and, unless dissolved by payment, shall as of said date be considered a tax due and owing to the commonwealth, which may be collected through the procedures provided for by chapter 62C. In addition to the foregoing, no officer of any corporation which has failed to pay any such penalty may incorporate or serve as an officer in any corporation which did not have a legal existence as of the date said fine became due and owing to the commonwealth.

(c) Civil and criminal penalties pursuant to this section shall apply to employers solely with respect to their wage and benefit obligations to their own employees.

## COUNT IV

**All Plaintiffs v. All Defendants**
**Violation of G.L. c. 149 § 148A**

134.     Plaintiffs re-assert, re-allege, and re-avow paragraph Nos. 1 through and including 113 as though fully set forth herein.

135.     M.G.L. c. 149 s. 148A is entitled Employees seeking rights under provisions of this chapter; discharge or discrimination; punishment.

136.     Section 148A reads as follows: No employee shall be penalized by an employer in any way as a result of any action on the part of an employee to seek his or her rights under the wages and hours provisions of this chapter. – Any employer who discharges or in any other manner discriminates against any employee because such employee has made a complaint to the attorney general or any other person, or assists the attorney general in any investigation under this chapter, or has instituted, or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceedings, shall have violated this section and shall be punished or shall be subject to a civil citation or order as provided in section 27C.

137.     As asserted and stated above, the Defendants violated this Chapter/Section of the Massachusetts General Laws, and are subject to the provisions of 149 § 27C, as described in paragraph no. 133 above.

## COUNT V

**Plaintiff Scheffler v. Defendants CHE, Johnson, Poppe, Randolph, Deacon, and Brudnicki**
**Violation of G.L. c. 149 § 148A**

138.     Plaintiffs re-assert, re-allege, and re-avow paragraph Nos. 1 through and including 113 as though fully set forth herein.

139.     Under G.L. c 149 § 148A, if you are fired you should be paid in full on your last day.

140.     Plaintiff Scheffler was fired on September 20, 2021 and did not receive a paycheck on that date.

141.     Defendants CHE, Johnson, Poppe, Randolph, Deacon, and Brudnicki violated G.L. c. 149 148A regarding Plaintiff Scheffler.

## COUNT VI

### Plaintiff Sheehan v. All Defendants
### Violation of G.L. c. 175 § 9

142.     Plaintiffs re-assert, re-allege, and re-avow paragraph Nos. 1 through and including 113 as though fully set forth herein.

143.     Plaintiff Sheehan asserts violations of the Family and Medical Leave Act.

144.     On or about March 1, 2021, due to the amount of daily hours necessary, upward of fifteen to twenty, to fully grasp the situation at HLY and to make recommendations for improvements, recommendations which went unheeded, Sheehan went out on FMLA and was subsequently approved for that benefit.

145.     On or about May 3, 2021, Sheehan convinced his doctor that he felt ready to return to work.

146.     On or about May 19, 2021, Sheehan's mental health deteriorated a second time, and Sheehan's physician removed him from work.

147.     Sheehan was placed on FMLA, continuing treatment for his first approved instance of the benefit.

148.     On or about September 28, Sheehan's initial 26-week benefit of FMLA expired.

149.     On or about September 29, Sheehan received catastrophic FMLA approval for an additional 26 weeks of the benefit.

150.     Later that day, Sheehan received catastrophic FMLA approval.

151.     Plaintiff Sheehan re-asserts and re-avows paragraph Nos. 45 through 50 as occurring during this second FMLA benefit use.

152.     On or about October 18, 2021, while on catastrophic FMLA, Sheehan was terminated.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs ask this Honorable Court for the following:

   a.  Enter Judgment in favor of the Plaintiffs under each Count of this litigation;

   b.  Award Plaintiffs compensatory damages on the merits of the entire litigation as follows:

i.   Immediate injunctive relief: Reinstating Plaintiffs back to state services and placing Plaintiffs on administrative leave effective their respective termination dates, as well as their Human Resources files corrected to state they are no longer terminated employees;

ii.   Award lost wages times three, per Massachusetts General Law, accrued since the date of their respective terminations, plus interest on same, as well as an additional 15 years of service time;

iii.   Reinstatement and repayment of Plaintiffs' Massachusetts State Retirement Board contributions and service time lost in the interim;

iv.   Award all accrued vacation time since the date of the Plaintiffs' respective terminations;

v.   Award all accrued holiday time since the date of the Plaintiffs' respective terminations;

vi.   Award all accrued personal time since the date of the Plaintiffs' respective terminations;

vii. Award any and all merit salary adjustments made during this period to management EXMT employees;

viii. Award punitive damages for the infliction of emotional distress on Plaintiffs by the Defendants, at a rate of the Plaintiffs' annual salary – Sheehan at $142,000.00 per annum, Scheffler's at $157,000.00 per annum – times 15 years;

c.   In addition, Plaintiffs request all costs, fees, and expenses including without limitation attorney's fees incurred by them in this action; and

d.   Grant them such other and further relief in the form of punitive damages as this Honorable Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

The Plaintiffs demand a trial by jury on all issues so triable.


Dated: August 12, 2022

Respectfully submitted,
Eric Sheehan and Beth Scheffler
By their attorney,


_/s/ Andrew J. Couture_____
Andrew J. Couture, Esq. (BBO: 671193)
Law Office of Andrew J. Couture
77 Merriam Avenue
Leominster MA 01453
978-502-0221
attycouture@gmail.com